# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

JUANITA A. VALCARCEL,

        Plaintiff,

v.                                             Case No. 08-CV-1009

SOCIAL DEVELOPMENT COMMISSION,

        Defendant.

_____

# ORDER

On November 25, 2008, plaintiff Juanita A. Valcarcel ("Valcarcel") filed a complaint against her employer, Social Development Commission ("SDC"), alleging racial discrimination claims pursuant to 42 U.S.C. § 2000-e, and 42 U.S.C. § 1981. On April 9, 2009, Valcarcel amended her complaint to add claims for retaliation in violation of § 2000-e and § 1981. Thereafter, on October 16, 2009, SDC filed a motion for summary judgment on all claims. A month later, Valcarcel filed a motion to amend her complaint. Upon review of the motions before the court, the court finds that, based on the briefings and claims presently before the court, SDC is entitled to summary judgment. Further, based on Valcarcel's failure to comply with the local rules in regards to a motion to amend complaint, the court is compelled to deny Valcarcel's motion to amend.

# BACKGROUND[1]

SDC is an intergovernmental agency, the purpose of which is to provide services and support to low income families. Valcarcel is a Hispanic woman who began working for SDC in 1989 as a secretary at SDC's South Side Neighborhood Center ("South Side Center"). After two years, Valcarcel was promoted to the position of Program Assistant at the South Side Center. Then, in 1993, Valcarcel was promoted to the position of Program Coordinator at the South Side Center, a position in which she remained until she was promoted in 2000 to Team Manager at the South Side Center. Each of these promotions involved an increase in pay and in salary grade scale.

In October 2004, Valcarcel was moved laterally from Team Manager at South Side Center, to Support Service Supervisor at SDC's Executive Offices; this move did not involve a change in salary grade level. Then, in 2005, Valcarcel applied to be the manager of SDC's Energy Assistance Program.[2] Valcarcel interviewed with Diane Robinson, who is African-American, for the position. Pursuant to Robinson's recommendation, Valcarcel was approved for the promotion to "Manager, Energy" (as the position is titled). The promotion became effective on September 12, 2005,

---

[1] In setting forth the facts, the court has relied on the undisputed portions of the parties' proposed findings of facts.

[2] SDC's Energy Assistance Program provides low-income households with assistance in paying energy bills and ensuring the continuation of energy services.

and resulted in an increase in Valcarcel's pay grade from 16 to 22, and an increase in her hourly wage from $22.96 to 28.51.

At Valcarcel's first annual Performance Evaluation (in the "Manager, Energy" position) – which was conducted by Robinson and Sandra White[3] – Valcarcel was given a rating of "proficient," which entitled her to a raise from $28.51 to $29.45. Valcarcel also received a rating of "proficient" on her second annual Performance Evaluation, which was conducted by White in September 2007, who had since become Valcarcel's direct supervisor. This rating entitled Valcarcel to a raise from $29.45 to $30.79.

However, Valcarcel was not happy with certain aspects of White's 2007 evaluation. Accordingly, Valcarcel submitted a written response to her second annual Performance Evaluation, which she submitted to SDC's Human Resources Department. In response, Janet Stenlund, SDC's Director of Program Services (which oversees approximately twenty programs grouped into six different units, one of which is the Adult Services Division), prepared a memorandum dated September 21, 2007, that she then reviewed with Valcarcel and White. In her memorandum, Stenlund expressed "dismay" at Valcarcel's reaction to White's evaluation, and Stenlund critiqued Valcarcel for having rated herself as "outstanding" after her first year in the position, and for not identifying a single area needing improvement. Stenlund explained that this was not a realistic self-assessment. Stenlund went on

---

[3] Sandra White ("White") is also African-American, and was the head of the Adult Services Division, a position that entailed overseeing the Energy Assistance Program.

to identify two specific areas in which Valcarcel needed to improve: "(1) communicating with clients and with staff and (2) analyzing program variables to improve performance and to maximize existing resources." (Stenlund Aff., Ex. 7). Stenlund's memo went on to give an example of an assignment ("the June 1, 2007 Report") Valcarcel had been asked to complete earlier in the year that involved an analysis of the production and staffing of the program's sites. The memo stated that the assignment was never fully completed, and that Valcarcel had failed to identify that continuing services at the program's Beulah Britton site was an inefficient use of program resources – though apparently the site itself advised that services should be discontinued there due to low participation. Stenlund summarized her concerns by explaining that Valcarcel needed to be more open to feedback, and that while she had "shown good day-to-day management of the Energy Program, [she had] not demonstrated the ability to analyze data and a multiple set of factors to implement efficiencies or innovative ideas." (Id.). The memo also mentioned that it was problematic that Valcarcel did not have a Bachelor's Degree.

Also during September of 2007, Stenlund learned that the Energy Assistance Program would be growing substantially due to the fact that the Milwaukee County Department of Health and Human Services was going to cease operation of its own energy-assistance program. It was anticipated that this would result in SDC serving approximately another 11,000 clients per year. At the same time, the resources with which SDC was to operate its Energy Assistance Program were diminishing. White,

in particular, was concerned that Valcarcel did not have a strong enough accounting background or analytical skills to continue managing the expanding Energy Assistance Program.

In connection with the growth of the program, the description of the position of "Manager, Energy" was revised in December of 2007, and an announcement for the position was posted. The Human Resources Department also "re-leveled" the position, taking it from a salary grade level 22 to level 23. Valcarcel was advised by a letter dated December 12, 2007, that she would be moved to the position of "Supervisor, Energy Program" and that she would report to the Manager of the Energy Assistance Program. She was also advised that her hourly pay would accordingly adjust from $30.79 per hour to $25.46 per hour. Ultimately, SDC hired Tara Pray, a white female, as the new Manager of the Energy Assistance Program.

## ANALYSIS

### I. Legal Standard

Summary judgment is appropriate where the movant establishes that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Material facts" are those facts which "might affect the outcome of the suit," and a material fact is "genuine" if a reasonable finder of fact could find in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate where a party has failed to make "a showing sufficient to establish the

existence of an element essential to that party's case and on which the party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 317. A party opposing summary judgment may not rest upon the mere allegations or denials of the adverse party's pleading, but must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). Any doubt as to the existence of a material fact is to be resolved against the moving party. *Anderson*, 477 U.S. at 255.

## II.    Racial Discrimination Claims

Valcarcel has brought racial discrimination claims pursuant to 42 U.S.C. § 1981 and 42 U.S.C. § 2000-e (commonly referred to as "Title VII"). There are essentially two methodologies by which a plaintiff can proceed on a racial discrimination claim: either the direct method, or the indirect method. Valcarcel relies exclusively on the indirect method, which is also known as the *McDonnell Douglas* burden shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under the *McDonnel Douglas* framework, the initial burden is on the plaintiff to establish a prima facie case of discrimination. Such a prima facie case is established by proving that the plaintiff:  1) was a member of a protected class; 2) was performing her job satisfactorily; 3) experienced an adverse employment action; and 4) similarly situated individuals were treated more favorably *Rhodes v. Illinois Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004). If she can establish this prima facie case, then the burden shifts to the defendant to articulate a legitimate, non-

discriminatory reason for the action. *Id.* If the defendant can do so, the burden shifts back to the plaintiff who must then show that the given reason is in fact a mere pretext for discrimination. *Id.* This analysis is the same for both § 1981 claims and Title VII claims. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403-04 (7th Cir. 2007).

SDC argues that Valcarcel fails to establish a prima facie case of discrimination, as she cannot point to any similarly situated individuals who were treated more favorably. Additionally, SDC argues that even if Valcarcel were to establish a prima facie case, she fails to demonstrate that SDC's stated reason for Valcarcel's demotion is a mere pretext for discrimination.[4]

## A. Similarly Situated Individual

The requirement that a plaintiff identify at least one similarly situated individual that was treated more favorably than the plaintiff is a requirement that "should not be applied mechanically or inflexibly." *Hull v. Stoughton Trailers, LLC*, 445 F.3d 949, 952 (7th Cir.2006). The similarly situated requirement "normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or

_____

[4] Also, SDC argues that it is a governmental unit, and thus Valcarcel cannot succeed on a discrimination claim against it unless she can show that said discrimination was any one of: an express policy, an ingrained custom, or an act attributable to an individual with final decision-making authority. *See McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000). Valcarcel disputes that SDC is a governmental unit. However, given the fact that Valcarcel cannot prevail even if she is correct about SDC's status as a non-governmental body, there is no necessity that the court resolve whether SDC is a governmental body. Given the paucity of the briefings on the issue, the court finds it most prudent not to resolve the issue of SDC's status, particularly given that such a ruling could have legal ramifications beyond the instant litigation.

mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir.2000). However, ultimately, the court is to consider all relevant factors and is "not to lose sight of the common-sense aspect of [the] inquiry." *Humphries*, 474 F.3d at 404-05.

Valcarcel identifies two individuals as prospective similarly situated individuals for purposes of establishing her prima facie case. Valcarcel points to Tara Pray, a white female, as one such individual. She also points to Rochelle Williams, an African-American female, as another such individual.

### 1. Tara Pray

Tara Pray ("Pray") was hired in early 2008 to serve as the Manager of the Energy Assistance Program – the position held by Valcarcel prior to SDC's decision to revise the requirements and responsibilities attendant to the position. Prior to being hired by SDC, Pray earned a Bachelor's Degree in Business Administration from the University of Wisconsin-Milwaukee ("UWM") in 2005, and she also attained a graduate certificate in non-profit management from UWM in 2008. While in college, Pray worked as an assistant manager and then as a store manager for The Body Shop. She also worked for four years as store manager for an independent clothing store called Star Ship. During her time at Star Ship, Pray also worked as the head buyer for the company's two stores, and "was in charge of analyzing the budget and buying all of the merchandise for the stores," which required "look[ing]

at sales trends and forecasts, [and] analyz[ing] data." (DPFF ¶ 82). In January 2006, Pray went to work for Coleman and Williams, a CPA firm where she performed audits for both for-profit and non-profit companies. After a year at Coleman and Williams, Pray was put in charge of a staff on audits, which meant that she "was in charge of planning the audit, putting the budget together, and requesting the documents from the organization that was being audited, and [that] she served as the main contact point with the organization." (DPFF ¶ 92). Additionally, she was required in that position to "make sure that the staff was on track, to assist staff with questions, [and] to provide coaching." (DPFF ¶ 93).

Attendant to the earning of her above mentioned graduate certificate, Pray volunteered at SDC during Autumn of 2007. Her volunteer work at SDC involved sales and marketing analysis and projections. Following the completion of her volunteer project at SDC, Pray contacted SDC and expressed an interest in any future job opportunities. At such time, Pray was informed that there were openings, and as a result she checked SDC's website, where she learned of the "Manager, Energy" position to which she applied and was hired.

Given the above description of Pray, it is clear that she is not an adequate comparator in terms of fulfilling the fourth prong necessary to establishing a prima facie case. First off, Pray had earned a Bachelor's Degree in Business Administration; Valcarcel did not have any advanced degree, much less one as relevant as Pray's. Hence, Pray and Valcarcel were not similarly situated in terms

of educational backgrounds; Pray was clearly more qualified.  Secondly, Pray had years of experience with budgeting, auditing, data analysis, and serving as a manager.  Valcarcel started out as a secretary, and did not obtain a management position until eleven years later in 2000.  Additionally, Valcarcel has not even alleged that any of her prior positions involved budgeting, auditing, or conducting data analysis.  Hence, Pray and Valcarcel were not similarly situated in terms of relevant work experience; Pray was clearly more qualified in terms of the type of skills the revised "Manager, Energy" position required.  Lastly, Pray had no negative prior interactions with Stenlund and White, whereas Valcarcel had been unhappy with White's evaluation of Valcarcel, and had disputed it.[5]  Hence, Pray and Valcarcel were not similarly situated in terms of prior interactions with White and Stenlund (the individuals to whom the person serving as Manager of the Energy Assistance Program had to be accountable).  Ultimately, it is abundantly clear that Pray and Valcarcel were not similarly situated, and that Pray was objectively more qualified in the areas in which Stenlund had identified Valcarcel as needing improvement.

Indeed, Valcarcel does not make any arguments in support of the notion that Pray was a similarly situated individual.  Valcarcel claims that Deborah Blanks (SDC's CEO, and the person with final hiring authority at SDC) agreed to hire Pray,

---

[5] It is irrelevant whether the negative aspects of White's evaluation were deserved or not, the fact is that there is nothing racially discriminatory about being displeased with a manager that disputes negative aspects of a review, rather than seeking solutions to improve upon those areas.  Even if White's criticisms of Valcarcel in the review were unjustified, Stenlund was nonetheless justified in being skeptical of Valcarcel's ability to improve based on Valcarcel's reaction to White's evaluation.

but did not mention Pray's managerial experience in her (Blanks's) deposition as part of the reason Pray was hired. Valcarcel's implication is that even if Blanks knew of Pray's experience in gathering and analyzing data, the position also required managerial experience, which Blanks did not know Pray had. Additionally, Valcarcel argues that the fact that Valcarcel had to train Pray to take over as manger indicates that Pray was not qualified.

First off, plaintiff's counsel did not ask Blanks if she knew of Pray's managerial experience, so there is no way to know whether she knew or not. Secondly, Blanks testified that she deferred heavily to White and Stenlund (the individuals who conducted the interviews for the position, and with whom the new manager would be working) as to the hiring of Pray. Obviously, White and Stenlund were aware of Pray's experience as a manager. Third, it is common practice everywhere to have a person be trained when they start a new job. The fact that Valcarcel was the person conducting the training is meaningless; there was never a concern that Valcarcel did not understand the position, the concern was that she did not possess the adequate skills, education, and attitude to excel in the position. Lastly, all of Valcarcel's arguments as to Pray go to the question of whether SDC's rationale for demoting Valcarcel were pretextual, not as to whether Pray was similarly situated. Thus, it is clear that Valcarcel and Pray were not similarly situated individuals.

### 2.  Rochelle Williams

Rochelle Williams ("Williams") is an African-American female who was hired to be a Team Manager at SDC's Family Support Center ("FSC"). However, it became apparent that Williams did not have the specific supervisory skills necessary to manage the FSC, thus she was demoted to the position of Transitional Living Center ("TLC") Case Manager. This demotion moved Williams from a salary grade level 22 position to a salary grade level 15 position, thus Williams's pay was reduced from $28.90 per hour to $23.10 per hour. However, a month later, Williams's pay was restored to $28.90 at the request of the Chief Executive Officer. In both of her positions, Williams was managed by White, who answered to Stenlund.

Obviously, Williams and Valcarcel were similarly situated in several key regards. They were both demoted from the same salary grade level (22) down to the same salary grade level (15). They were also both demoted for similar reasons (they lacked the skills necessary to succeed at their managerial positions).

However, Williams and Valcarcel differed in key regards as well. Williams had a Master of Science in Education Degree. Hence, Williams, who had a postgraduate master's degree in a field directly applicable to her line of work, was not similarly situated to Valcarcel, who had a high school diploma. Additionally, Williams had a "strong background in counseling and guidance," and was "highly professional and turned out be very capable of dealing with the clients with which the agency was

having problems." (DPFF ¶¶ 155,156).[6]  Conversely, the supervisor position to which Valcarcel was reassigned did not require a unique skill set (or at lease Valcarcel has not alleged as much), such as counseling and guidance, nor is there any indication (or allegation from plaintiff) that Valcarcel filled a specific need that SDC was experiencing.  Hence, Williams, who had a strong background in guidance and counseling – for which SDC was experiencing a particularized need – was not similarly situated to Valcarcel, who had no unique skills, and who was not able to fulfill any particularized need SDC was experiencing.[7]  Thus, despite the fact that Valcarcel and Williams were similarly situated in some regards, the court – keeping

---

[6] Plaintiff actually does dispute defendant's proposed finding of fact at paragraph 155; however, plaintiff does not actually respond to the substance of the assertion.  Defendant's proposed finding of fact at paragraph 155 states:

> Because of Ms. Williams strong background in counseling and guidance, because of her skills, because of particular problems with some of the clients at the TLC, and because of the agency's very real needs at the time, SDC asked Ms. Williams to assume the position of TLC Case Manager.

(DPFF ¶ 155).  Plaintiff's response states:

> Argumentative. Ms. Williams was demoted from a level 22 position to a level 15 position because Sandra White felt Williams was having trouble communicating with staff as a manager of a larger facility.

(Pl. Resp. DPFF ¶ 155).  What plaintiff's response fails to appreciate is that DPFF ¶ 155 does not pertain to why Williams was demoted (that is addressed in DPFF ¶ 152, which plaintiff does not dispute), but rather it speaks to the rationale underlying Williams assignment following her demotion.  Additionally, plaintiff does not dispute the aspect of the proposed finding of fact cited by the court, namely that Williams had a strong background in counseling and guidance.

[7] The fact that SDC is a nonprofit entity does not mean it is immune from the laws of supply and demand.  SDC must compete to attract and retain valuable employees just as all businesses must.  All indications are that Williams earned more than Valcarcel not because of the color of her skin, but because she was more educated, and possessed a more needed set of skills.  Simply put, there is a far greater supply of Valcarcel's (high school educated individuals with no unique abilities) in the world than there are Williams's (postgraduates with unique abilities), and there is far greater demand for the latter than there is the former.

in mind that it is "not to lose sight of the common-sense aspect of [the] inquiry," *Humphries*, 474 F.3d at 404-05 – is obliged to find that Williams and Valcarcel were not similarly situated individuals.

Because Valcarcel has not identified any similarly situated individual who was treated more favorably than her, she has failed to establish a prima facie case under the *McDonnel Douglas* framework. As such, SDC is entitled to summary judgment on Valcarcel's racial discrimination claims brought pursuant to Title VII and § 1981.

## B. Pretextual Explanation

If the court is mistaken in finding that neither Williams nor Pray were similarly situated individuals with Valcarcel, then that would mean that Valcarcel has made a prima facie case, and that the burden then shifts to SDC to offer a non-discriminatory rationale for Valcarcel's demotion. SDC has done so, explaining that Valcarcel was demoted from Manager of the Energy Assistance Program because White and Stenlund did not believe that Valcarcel had the education or ability to handle the position given the growth the program was going to be experiencing.

In evaluating the merits of a defendant's proffered nondiscriminatory rationale the court is unconcerned with the "correctness" of the rationale, only with whether or not it was the actual ground. *See Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 417-18 (7th Cir. 2006). Thus, to make it to trial, plaintiff must be able to proffer some evidence sufficient to allow a reasonable juror to infer that defendant's proffered rationale was not the actual rationale that compelled the action.

In Stenlund's memo, presented to Valcarcel several months before Valcarcel was demoted, Stenlund pointed out to Valcarcel that there were issues with her managerial style, that it appeared that she was not capable of handling the type of data gathering and analysis the position required, and that it was problematic that she did not have a college degree. Valcarcel proffers several arguments as to why these were not the real reasons for her demotion, arguing that these were mere pretexts for SDC's discriminatory animus.

Valcarcel asserts that there was no problem with her analytical skills, and to support this she points out that White did not raise the issue of the analytical skills in her evaluation. Valcarcel also points out that the issues with the June 1, 2007 Report were not raised until Stenlund's memo, which was drafted and presented in September 2007. However, the fact that Stenlund, who was looking ahead to the future needs of the position, would raise differing issues than White is neither surprising nor evidence of pretext. Additionally, Valcarcel is incorrect in arguing that she was not previously aware of Stenlund's displeasure with Valcarcel's June 1, 2007 Report; Stenlund discussed the incompleteness of the report with Valcarcel

shortly after Valcarcel submitted it; however, Valcarcel never remedied the problem. (DPFF ¶ 53).[8]

The only other arguments that Valcarcel advances in support of the notion that SDC's reasons were pretextual are the previously described arguments regarding Pray. Again, these were that Blanks was not aware of Pray's managerial experience and that Pray was not qualified, given the fact that SDC had Valcarcel train Pray. As the court already pointed out, there is no evidence either way as to Blanks's knowledge of Pray's managerial experience. However, it is clear that Pray had ample managerial experience, and that White and Stenlund (both of whom interviewed Pray; and both of whom Blanks stated she deferred to) would have known of this experience. As to the fact that Pray required some training once she started, no reasonable juror could infer that this meant that Pray was unqualified and thus must have been hired because she was not Hispanic. Rather, the fact that Pray had solid credentials in the areas in which Valcarcel was weak (or at least in which White and Stenlund perceived Valcarcel as weak) suggests that finding someone

_____

[8] In response to defendant's proposed finding of fact at paragraph 53, plaintiff states that issues of fact exist because White testified that she, Stenlund and Valcarcel met to discuss the June 1, 2007 Report in June or July, and no issues were raised regarding the completeness of the report. (Pl. Resp. DPFF ¶ 53). However, White testified that she was not aware whether those conclusions had been made or not yet at that time. (White Dep. 44:11 - 45:05). Additionally, there is nothing to indicate or suggest that Stenlund's concerns about the completeness of the report were made known to White prior to the September memo. Thus, White's testimony offers no illumination of the issue. Therefore, plaintiff's attempt to dispute defendant's proposed finding of fact is ineffectual, since the evidence to which plaintiff cites does nothing to cast doubt on defendant's proposed finding, which relies on directly-on-point affidavit evidence.

with strong managerial experience as well as the ability to conduct audits and analyze data were the true animus spurring White and Stenlund's actions.

As Valcarcel has not proffered any evidence from which a reasonable juror could conclude that SDC's proffered nondiscriminatory rationale was mere pretext, the court is obliged to award SDC summary judgment as to Valcarcel's racial discrimination claims brought pursuant to § 1981 and Title VII.

## III.    Retaliatory Discrimination Claims

Valcarcel has also brought claims under § 1981 and Title VII for retaliatory discrimination, alleging that SDC discriminated against her in retaliation for her filing of a racial discrimination suit against SDC.  Like racial discrimination claims, an employee who charges an employer with retaliatory discrimination may proceed on her claim utilizing either the "direct method" or the "indirect method."  It is evident from Valcarcel's pleadings and brief that she is proceeding under the direct method as to her retaliation claim.

In order to state a prima facie case of retaliation under the direct method, Valcarcel must produce evidence that:  "(1) [she] engaged in statutorily protected activity; (2) [she] suffered an adverse employment action; and (3) there is a causal link between the protected expression and the adverse action." *Lalvani v. Cook County, Illinois*, 269 F.3d 785, 791 (2001).  If she succeeds in establishing a prima facie case, then SDC must proffer a legitimate business reason for the adverse

employment action. *Id.* If SDC is able to proffer a legitimate explanation, then Valcarcel must present evidence that said explanation is merely a pretext. *Id.*

SDC argues that Valcarcel fails because she cannot demonstrate that she was subjected to an adverse employment action subsequent to her filing of her initial discrimination claim. Additionally, SDC argues that certain of the alleged adverse employment actions were warranted based on Valcarcel's actions coupled with employee and client complaints. Accordingly, the court will evaluate each of Valcarcel's alleged adverse employment actions[9] in turn to determine whether or not each in fact constitutes an adverse employment action, and, for those that do, whether SDC has proffered a legitimate explanation in response.

An "adverse employment action" typically must be something "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Crady v. Liberty National Bank and Trust Co. of Indiana,* 993 F.2d 132, 136 (7th Cir. 1993). Rather, it usually must be "a significant change in the claimant's employment status, such as hiring, discharge, denial of promotion, reassignment to a position with significantly different job responsibilities, or an action that causes a substantial change in benefits." *Rhodes*, 359 F.3d at 504. While the definition of "adverse employment

---

[9] The court will only consider those adverse employment actions that are mentioned, or at least referenced, in Valcarcel's amended complaint. Any adverse employment actions that are raised for the first time in response to summary judgment will not be considered. Additionally, to the extent that Valcarcel attempts to claim that memos drafted by Pray and placed in Valcarcel's human resources file are adverse employment actions, Valcarcel is mistaken. If action was taken based on said memoranda, such action could be an adverse employment action, but memos of which Valcarcel was unaware, and which themselves had no impact upon the conditions of her employment, do not constitute adverse employment actions.

action" may be slightly more expansive in the context of a retaliation claim, the fact is that the action must be "materially adverse" and must carry with it "tangible job consequence[s]." *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998).

The first adverse employment action of which Valcarcel complains is an investigation conducted by SDC looking into whether Valcarcel committed fraud. The investigation commenced subsequent to Pray submitting a report, on December 2, 2008, to SDC's auditor concerning an application for the Wisconsin Home Energy Assistance Program completed by Valcarcel on behalf of another SDC employee, Sonya Eddie, in September 2008. Sonya Eddie was not investigated for fraud. Given the close temporal proximity between SDC being served with Valcarcel's complaint (which occurred on December 1, 2008), and the commencement of the investigation,[10] Valcarcel could likely fulfill the causation prong. However, it is the adverse employment action requirement on which Valcarcel fails. Valcarcel admits that the investigation did not result in any finding of wrongdoing or in any discipline action being taken against Valcarcel. While being investigated was likely an annoyance, "not everything that makes an employee unhappy is an actionable adverse action." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996). Similarly, while it seems unfair that Valcarcel was treated differently than Eddie,

---

[10] "When an adverse employment action follows close on the heels of protected expression, and the plaintiff can show that the person who decided to impose the adverse action knew of the protected conduct, the causation element of the prima facie case is typically satisfied." *Lalvani v. Cook County, Illinois*, 269 F.3d 785 (7th Cir. 2001).

"different treatment that has little or no effect on an employee's job" is not prohibited. *Sweeney*, 149 F.3d at 556.

The next adverse employment action of which Valcarcel complains stems from a meeting held by Pray on January 13, 2009. On January 12, 2009, Pray emailed Benjamin Biddle ("Biddle") an employee directly supervised by Valcarcel, and requested a meeting with him. Pray and Biddle met the next day. During the meeting, Pray sought information from Biddle about Valcarcel allegedly yelling at a client. Biddle has testified that he remembers informing Pray that he was not aware of Valcarcel committing the alleged misconduct. Biddle has further testified that Pray went on to speak about a new position that SDC might be creating, and that Biddle could potentially fill, but that Pray was looking for more information about Valcarcel allegedly swearing at a client. According to Biddle, he perceived Pray's actions as insinuating that he would improve his chances of attaining the potential position if he were to provide Pray with information about Valcarcel.

To be sure, Pray's interaction with Biddle certainly appears untoward, but the question remains whether it is sufficient to "prompt a federal case." *Id.* The reason it does not rise to the level of being an adverse employment action is because ultimately it lacks the requisite materiality. No aspect of Valcarcel's employment was altered as a result of Pray's action. The actions are troubling, in part, because one can envision that they certainly could have led to Valcarcel being undeservedly subjected to an adverse employment action. However, in this instance they did not.

Had Biddle fabricated information, and Pray acted on it, then Valcarcel would have had a legitimate claim. However, Biddle maintained to Pray that he had not witnessed Valcarcel engage in misconduct, and thus nothing ever occurred as a result of that meeting. Thus, this occurrence does not rise to the level of being an adverse employment action.

The next action of which Valcarcel complains occurred on January 14, 2009, when Mike Hammack ("Hammack"), SDC's human resource director, issued Valcarcel a written warning. Hammack indicated that Valcarcel was receiving the warning because over the previous weeks SDC had received complaints from two customers and two employees alleging that Valcarcel was using loud and profane language at work, and that Valcarcel and others had been smoking in the building. Valcarcel takes issue with this because she was not informed of these complaints prior to being issued the written warning, she was not first issued a verbal warning (or given some other lesser form of disciplinary action),[11] and she was not given any evidence corroborating the complaints made against her.

A written warning with no additional consequences is not sufficient to constitute an adverse employment action. *See Sweeney*, 149 F.3d at 556 (stating that being "unfairly reprimanded" does not fall within the definition of adverse

---

[11] Valcarcel claims that written warnings are not the first form of punishment employed at SDC, but are a more advanced type along SDS's progressive discipline spectrum. However, Valcarcel admits that there is absolutely no requirement that a lesser form of punishment be issued first, nor does Valcarcel point to a similar employee who received a lesser form of punishment in a similar situation.

employment action, "[a]bsent some tangible job consequence accompanying those reprimands."). Further, even if it were an adverse employment action, the causation prong can only be fulfilled if the warning was unwarranted (or if similarly situated individuals were not issued warnings). Typically the burden would be on SDC to show that it was warranted; however, in the instant case, Valcarcel has not alleged that no one complained about her. She instead focuses on the fact that SDC did not giver her prior warnings about the complaints, and that SDC did not give her evidence of the complaints. However, no where does she offer any evidence that it was SDC's policy to do either of those things. Because Valcarcel has not presented any evidence casting doubt on the fact that the complaints were actually made, she has not sufficiently alleged that the warning stemmed from a retaliatory animus.[12] Hence, SDC is entitled to summary judgment on Valcarcel's retaliatory discrimination claim to the extent that said claim relies on the written warning Valcarcel received on January 14, 2009, as a predicate adverse employment action.

---

[12] Affidavit evidence from employees stating that they did not witness Valcarcel engaging in misconduct does not negate allegations that she did engage in misconduct. To fulfill the causation prong, Valcarcel should have submitted evidence showing that the complaints on which the warning was based were never made. If the complaints were made, then SDC was justified in issuing the warning, regardless of the veracity of the complaints. There is no rule that SDC investigate complaints, or that SDC be "correct" all the time; rather, they simply have to be animated by non-retaliatory motives.

Similarly, Valcarcel attempts to claim that Pray and Hammack's testimony regarding the complaints is hearsay since the complainants themselves did not testify. However, SDC does not have to prove that there were complaints; Valcarcel has to proffer evidence that Hammack's decision to issue Valcarcel a written warning was motived by retaliation. If Hammack believed that there were complaints, then Valcarcel needs to present evidence that either Hammack did not actually so believe, or that Pray made up the complaints; Valcarcel has not presented any evidence that would allow a reasonable juror to reach either of those conclusions.

The final adverse employment action of which Valcarcel complains relates to a performance evaluation completed by Pray on or about March 24, 2009. The evaluation covered Valcarcel's first year, March 26, 2008, through March 25, 2009, in her new position as supervisor. Pray rated Valcarcel "reliable"; she did not provide Valcarcel with a corrective action plan. On April 7, 2009, Valcarcel emailed Pray, setting forth the aspects of the performance evaluation that Valcarcel felt were unfair or simply unattainable. Valcarcel further requested an opportunity to meet with Pray to discuss the evaluation. Pray responded that she felt that the targets placed on the evaluation were attainable, she pointed out that when presented with the evaluation, Valcarcel chose not to discuss it, but instead stormed out of the office slamming the door. Pray then went on to state that if Valcarcel was now ready to discuss the evaluation, Pray would be happy to meet with her and do so.

Valcarcel takes issue with the performance evaluation specifically because of the allegedly "unattainable goals" therein. However, Valcarcel has not alleged (in her operative complaint) any actual negative effect on her employment status or the conditions of her employment – or any tangible consequences whatsoever – that resulted from this performance review. The goals that she alleges are unattainable read:

> Communicate positively with clients. No client complaints. Treat
> clients with respect, even if wrong.
> Communicate positively and respectfully with employees, both in the
> Energy program and others, as well as with supervisor. No negative
> reports. Ensure positive atmosphere at worksites.
> Address inappropriate behavior.
> 100% support of Program goals and changes. Meet [with] manager as
> needed, maintain positive communications. Provide positive
> input. Support management's decisions.

(Depo Ex. 39, [Dkt. #22, Ex. 3], p. 77). As support for the notion that the above

goals were unattainable, Valcarcel points to White's deposition where, in response

to the question of how attainment of these goals could be measured, White said:

"Well, it could be difficult, but it could possibly be measured based on whether or not

there were a number of complaints that would come in." (White Depo. [Dkt. #22, Ex.

1] 96:17-20).

The court finds there to be nothing unrealistic or untoward about the goals set

out in Valcarcel's performance review. Nor does the court find that White's

testimony supports the notion that these goals were either unattainable or

unmeasurable. Additionally, "unfair reprimands or negative performance

evaluations, unaccompanied by some tangible job consequence, do not constitute

adverse employment actions." *Grube v. Lau Industries, Inc.*, 257 F.3d 723, 729 (7th

Cir. 2001). As such, the complained of performance evaluation does not constitute

an adverse employment action.

Because Valcarcel has not alleged any adverse employment action that can be causally linked to her filing a racial discrimination complaint, SDC is entitled to summary judgment on Valcarcel's retaliatory discrimination claims.

## IV.    Motion to Amend Complaint

On November 16, 2009, Valcarcel filed a motion to amend the complaint, seeking to add an additional adverse employment action in support of her retaliation claim, and possibly adding additional defendants in their individual capacity. The court, however, cannot reach the merits of Valcarcel's motion to amend, as plaintiff's counsel failed to comply with the requisite local rules. Civil L.R. 15.1 (which was the governing rule at the time Valcarcel's motion was filed) states in relevant part: "Any party submitting a motion to amend must attach to the motion the original of the proposed amended pleading." This rule is not merely formalistic; it is an important substantive rule with which parties are required to comply. As plaintiff's counsel did not attach a copy of the proposed amended complaint, the court is obliged to deny Valcarcel's motion to amend.

## CONCLUSION

SDC is entitled to summary judgment on Valcarcel's racial discrimination claims because Valcarcel failed to identify any similarly situated individuals who were treated differently, thereby failing to establish a prima facie case under the *McDonnel Douglas* framework. Even if the court is mistaken as to the similarly-situated-individual issue, SDC is still entitled to summary judgment on Valcarcel's racial

discrimination claims because Valcarcel failed to proffer evidence that could support a finding that SDC's nondiscriminatory reasons for Valcarcel's demotion were pretextual. Further, SDC is entitled to summary judgment on Valcarcel's retaliatory discrimination claims because Valcarcel has not identified (in her operative complaint) any materially adverse employment actions. Though Valcarcel might have amended her complaint to add an actual materially adverse employment action, the court is unable to grant her request to do so because her counsel failed to comply with the applicable local rule.

Accordingly,

**IT IS ORDERED** that defendant's Motion for Summary Judgment (Docket #13) be and the same is hereby **GRANTED**, and this action be and the same is hereby **DISMISSED** on its merits, together with costs as taxed by the Clerk of the Court; and

**IT IS FURTHER ORDERED** that plaintiff's Motion to Amend/Correct Complaint (Docket #23) be and the same is hereby **DENIED**.

The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 26th day of August, 2010.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge